IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

RICHARD FLAHERTY, et al.,      )
                               )
          Plaintiffs,          )
                               )
v.                             )      CIVIL ACTION NO. 1:05-1492
                               )
LEGUM & NORMAN REALTY, INC.,   )
                               )
          Defendant.           )


**MEMORANDUM ORDER**

THIS MATTER is before the Court on Defendant Legum & Norman

Realty Inc.'s ("Legum & Norman Realty") Motion to Preclude Expert

Testimony and Motion for Summary Judgment.  This case concerns a

wrongful death suit for the death of Monica Flaherty who died of

Legionnaire's disease[1] after visiting her family's condominium

unit at The Braemar Towers ("Braemar Towers") in Ocean City,

Maryland.  Defendant Legum & Norman Realty manages the

condominium complex and maintains and operates the complex's

water system.  Legionella bacteria were found in the water of the

condominium complex and specifically in the Flaherty's unit.  The

issues before the Court are: (1) whether Plaintiffs Richard

---

[1]Legionnaire's Disease is a severe bacterial infection of
the respiratory tract.  Onset of the disease may be mild, but it
should be suspected in any respiratory infection that gets
progressively worse over a period of several days.  Later
symptoms are similar to those of any respiratory infection:
coughing, shortness of breath, chest and abdominal pain,
headache, fever, nausea, vomiting, and diarrhea.  Centers for
Disease Control and Prevention, Legionellosis:  Legionnaires'
Disease (LD) and Pontiac Fever, Frequently Asked Questions (Oct.
12, 2005), http://www.cdc.gov/ncidod/dbmd/diseaseinfo/
legionellosis_g.htm#1.

Flaherty, et al.'s ("Flaherty")[2] experts are qualified to establish the standard of care that a professional management company must exercise in operating and maintaining the water system of a condominium complex in Ocean City, Maryland; and (2) whether the Court should grant Defendant's Motion for Summary Judgment on Plaintiff's claims of negligence, gross negligence, and punitive damages because Plaintiff does not have sufficient evidence to establish the element of duty that Defendant owed to Mrs. Monica Flaherty in the operation and maintenance of the water system.

The Court grants Defendant's Motion to Preclude Expert Testimony and Defendant's Motion for Summary Judgment.  The Court grants Defendant's Motion to Preclude Expert Testimony because Plaintiff's experts are not qualified to establish the requisite standard of care, and the factual circumstances and other bases for their opinions are not sufficient to establish an applicable standard of care or the alleged breach of a duty arising under the standard of care.  Legionella bacteria are pervasive in both domestic and natural water systems around the world. (June 7, 2006 Dep. of Dr. Jennifer Clancy, at 15-16.)  There are no national or state mandated standards for the testing for or prevention of legionella bacteria in potable water by a property

---

[2]Because the Plaintiffs are Richard Flaherty and Richard Flaherty on behalf of others, this Memorandum Order will refer to Plaintiffs as Plaintiff Richard Flaherty in the singular for ease in understanding.

management company that the plaintiff's experts could point to establish an applicable standard of care. (*Id.* at 17-18.) The Court grants Defendant's Motion for Summary Judgment because without expert testimony to establish the applicable standard of care, Plaintiff cannot establish the duty that Defendant owed Mrs. Monica Flaherty. Additionally, the Court finds that Plaintiff cannot make a claim for gross negligence and, accordingly, cannot make a claim for punitive damages.

The Court finds that it is unnecessary to address whether the exculpatory clause in the Association By-Laws indemnifies Defendant Legum & Norman Realty from liability as an agent of the Condominium Home Owners' Association because Plaintiff has failed to establish Defendant's negligence.

## I. BACKGROUND

This matter arises from Plaintiff Flaherty's claim that Defendant Legum & Norman Realty failed to properly maintain and operate a water system and treat potable water against bacteria. Plaintiff contends that his wife, Monica Flaherty, contracted Legionnaire's disease from this bacteria, resulting in her death. In May 2004, the Flahertys purchased a condominium unit in Ocean City, Maryland that was part of the condominium complex Braemar Towers. Defendant Legum & Norman Realty was the professional management company that managed Braemar Towers. Defendant Legum & Norman Realty was responsible for operating and maintaining the water system at Braemar Towers that provided water to all of the

3

condominium units.

In December of 2004, Monica Flaherty went to the family's condominium unit because the family had received a letter from Legum & Norman Realty to move all personal items away from the walls of the unit. She stayed there from December 27, 2004, through December 29, 2004. (Pl.'s Statement of Disputed Facts ("SDF"). ¶ 47.) On January 10, 2005, Monica Flaherty died of Legionnaire's Disease. (*Id.* at ¶ 66.)

Two other people that stayed at Braemar Towers around the time of Monica Flaherty also contracted Legionnaire's Disease. Learning of these incidents, the Worcester Department of Health ("Department") investigated Braemar Towers water system. Upon testing the water after the incident, the Department found Legionella bacteria in the water at Braemar Towers and found Legionella bacteria specifically in the water of the Flaherty's unit.

The Flahertys commenced this wrongful death suit against Legum & Norman Realty. Defendant Legum & Norman Realty moves to preclude the testimony of Dr. Clancy and Dr. Barbaree, Plaintiff's proffered experts, claiming that they are insufficiently qualified to establish the requisite elements of negligence, specifically the standard of care and causation. Further, Defendant argues that Plaintiff's experts used methodologies that are not sufficiently relevant or reliable, so the testimony should not be admissible. Defendant Legum & Norman

4

Realty also moves for summary judgment, claiming that Plaintiff Flaherty cannot establish a prima facie claim of negligence, gross negligence, or punitive damages because Plaintiff cannot establish the requisite elements of these causes of action.

*Plaintiff's proffered expert testimony on standard of care and causation*

1. Dr. Clancy's Testimony

Plaintiff has proffered Dr. Clancy, a microbiologist, as a qualified expert to testify to the standard of care and causation in this case.  Dr. Clancy's expert report began by setting forth different opinions.  First, she discussed the characteristics of Legionella and Legionnaires' Disease, noting that the incubation period is usually between two (2) and fourteen (14) days, with symptoms that are similar to pneumonia, such as headache, rapid fever, chills, coughing, chest pain, etc.  Second, Dr. Clancy defined Legionella, focusing her discussion on Legionella pneumophila that causes about 90% of all documented cases of legionellosis and was found in Braemar Towers water system in 2005.

Third, Dr. Clancy set forth a six-link chain of causation that gives rise to human infection and the onset of Legionnaire's Disease: 1) an environmental reservoir where Legionella live, 2) one or more amplifying factors that allow the multiplication of the bacteria to high concentrations, 3) a mechanism of dissemination of the Legionella from the reservoir to a

susceptible population or host, 4) the virulence of the strain
(the strain must be capable of causing disease), 5) the
inoculation of the strain at a site on a human host where it is
capable of causing infection, and 6) the susceptibility of the
exposed person to infection.

Fourth, Dr. Clancy discussed characteristics of a water
source that could give rise to the presence of high
concentrations of Legionella.  Dr. Clancy noted that
amplification and dissemination in potable water systems is a
well-recognized potential source of Legionella infection and
stressed that temperature of the water plays a critical role.
She explained that Legionella multiply where the water
temperature is above 77 degrees Fahrenheit and can survive at
temperatures greater than 122 degrees Fahrenheit.  Dr. Clancy
stressed that hot water tanks should be set at temperatures of
140 degrees Fahrenheit, with a minimum water temperature of 122
degrees Fahrenheit in the return, to prevent amplification of
Legionella in the water tanks.

Fifth, Dr. Clancy discussed the transmission of Legionella
through the inhalation of aerosolized droplets.  She noted that
potable sources commonly known to transmit Legionella include
showers, water taps, and respiratory therapy equipment.  She also
mentioned that non-potable water sources such as cooling towers,
evaporative condensers, whirlpool spas, decorative fountains, and
humidifiers are known to transmit Legionella.

Sixth, Dr. Clancy stated that modern buildings with extensive water distribution systems where water temperature are below 122 degrees Fahrenheit are ideal breeding grounds for Legionella.  She stressed that good management practices are necessary to control Legionella, such as regular inspection, maintenance, proper operation, and proper cleaning of the water system to prevent the amplification step in the six-link causation chain that leads to the disease.

Seventh, Dr. Clancy discussed the applicable incubation period, noting that Mrs. Flaherty stayed at Braemar Towers between Christmas of 2004 and New Year's 2005.  After returning home, Mrs. Flaherty was admitted to the hospital intensive care unit on January 7, 2005 and died there on January 10, 2005. Legionnaire's disease was the diagnosed cause of death.  Dr. Clancy also called attention to the fact that two other individuals that stayed at Braemar Towers during this period contracted Legionnaire's Disease.

Eighth, Dr. Clancy pointed out that the Department investigated the building, and the report showed a lack of consistency in maintaining the hot water temperatures and periodic leaks in the water system.  In a letter dated January 21, 2005, the Department directed Braemar management to: 1) obtain professional services to remediate the water distribution system as soon as possible, 2) treat the domestic potable water for health protection, 3) obtain follow-up testing of the potable

water supply following treatment, and 4) develop a Legionella control program.

Ninth, Dr. Clancy noted that the Department's testing, focused on four units, including Mrs. Flaherty's, revealed heavy contamination with Legionella pneumophila.  The investigation revealed positive samples in the kitchen potable water drains, the master bath shower, and the bath hot drain of the Flaherty's unit.  Similar positive samples were found in the other units tested.  Further, the temperature of the potable water units ranged from 98 to 125 degrees Fahrenheit.  Daily temperature records of the hot water heaters from October 21, 2004 through January 19, 2005 showed that the water temperatures ranged from 95 to 138 degrees Fahrenheit.  Dr. Clancy stressed that the temperature of the tank must be at 140 degrees Fahrenheit to control the growth of Legionella.

Tenth, Dr. Clancy discussed the treatment of Braemar Towers' water system to reduce the level of Legionella below the detection limit that was initiated at the direction of the Department.

Dr. Clancy closed her opinion section with a discussion of Legum and Norman Realty's negligence in maintaining and operating the water system at Braemar Towers.  She called attention to the lack of maintenance of a bag filter in a stainless steel tank and the low temperature in the water heaters that would be insufficient to prevent the growth of Legionella but was in a

range known to promote the growth of the bacteria.  She stressed
that proper operation and maintenance are necessary to control
Legionella, and Defendant had the responsibility of properly
operating and maintaining the system.

Dr. Clancy also mentioned other factors that support the
assertion that Defendant was negligent in its operation and
maintenance of the water system.  She stated that publications
and training regarding operation and maintenance of water
supplies were readily available.  Further, Dr. Clancy pointed out
that training for plumbing certification in Ocean City, Maryland
had included training on Legionnaire's Disease since the mid-
1990s.  Finally, Dr. Clancy noted that the American Society of
Heating, Refrigerating and Air-Conditioning Engineers ("ASHRAE")
developed and published a standard in 2000, "Minimizing the Risk
of Legionellosis Associated with Building Water Systems."  To end
her opinion section in the expert report, Dr. Clancy concluded,
"[t]o a reasonable degree of scientific certainty, negligent
operation and maintenance of the Braemar Towers building potable
water system caused the growth of Legionella in the system and
the subsequent infection and death of Mrs. Flaherty."

Dr. Clancy then discussed the bases of her opinions.  Much
of the information that she included in this portion of her
report was summarized in the opinion section.  She went through
the history of Legionella bacteria and Legionnaire's Disease, the
characteristics of the bacteria and the disease, the role of
water in the transmission of Legionnaire's Disease, amplification

of Legionella in man-made systems, and how to control Legionella in water systems.  In her discussion of how to control Legionella in water systems, Dr. Clancy noted that the presence of Legionella in water systems is common and difficult to avoid, and there is no mandated testing of water supplies for the presence of Legionella.  Accordingly, she stressed that control of amplification is necessary.  To control amplification she stated that it is important to have a routine maintenance program, good water system management practices, including regular inspection, maintenance, and cleaning of the water systems, and the use of biocides.  In addition, she posited that a well-designed and properly operated maintenance program is the best protection against outbreaks or sporadic cases of Legionnaire's Disease.

Finally, Dr. Clancy reviewed the records for the case involving the contamination of Braemar Towers' water system and Mrs. Flaherty's illness and death records.  She discussed the Department's inspection, showing that Braemar Towers' water system had been poorly maintained.  In addition, a bag filter had been installed but not maintained, there were leaks in the system, and the water temperatures were optimal for growth of Legionella.  Further, water samples and swab surfaces in Mrs. Flaherty's unit and the unit of one of the other persons that had contracted Legionnaire's Disease revealed Legionella pneumophila. Dr. Clancy also discussed the applicable incubation period, pointing out the duration of Mrs. Flaherty stay at Braemar Towers, when the symptoms began, and when she subsequently died.

Dr. Clancy also called attention to the incubation period relative to the two others who contracted Legionnaire's Disease. Dr. Clancy concluded that, in her opinion, the inadequate operation and maintenance of the building water system contributed to the growth of Legionella in the water system, promoted dissemination, caused an outbreak, and led directly to the subsequent infection and death of Mrs. Flaherty.

### 2. Dr. Barbaree's Testimony

Dr. Barbaree is a professor of microbiology, with degrees in bacteriology, microbiology, and zoology.  Dr. Barbaree established that his opinion to a reasonable degree of scientific certainty is that Mrs. Monica Flaherty contracted Legionnaires' Disease at Braemar Towers.  Specifically, Dr. Barbaree based his opinion on his twenty-six (26) years experience with and knowledge of Legionella and Legionnaire's Disease and the information and materials provided by Plaintiff's attorneys, including medical records, Mrs. Flaherty's symptoms and circumstances during the relevant incubation period, his assessment of Braemar Towers' plumbing system, the results of environmental samplings, and Braemar Towers' history with Legionnaire's Disease.

First, in the his expert opinion report, Dr. Barbaree discussed the background of Legionnaire's Disease.  Dr. Barbaree then focused on Legionella pneumophila, the main species associated with the disease, the species found in Plaintiff's

condo, and the species targeted by the urinary antigen test performed on Mrs. Flaherty.  He subsequently addressed the presence of such bacteria in water systems and the transmission to humans by breathing aerosols.  Dr. Barbaree stated that most outbreaks of Legionnaire's Disease are due to man-made structures that disseminate Legionella in aerosols, such as cooling towers, hot tubs, evaporative condensers, and showerheads.

Second, he noted that Mrs. Flaherty had a confirmed case of Legionnaire's Disease, as demonstrated by the medical records and urine antigen test laboratory results.  In addition, Dr. Barbaree noted that pneumonia was ruled out as an option.

Third, Dr. Barbaree discussed the onset of the disease in Mrs. Flaherty in a time period that was in keeping with a standard incubation period for Legionnaire's Disease.  He elaborated that Mrs. Flaherty's stay at Braemar Towers from December 27-29, 2004, her development of symptoms of illness on January 1, 2005 and of a respiratory condition on January 2, 2005, fits within the characteristic 2-10 day incubation period.

Fourth, Dr. Barbaree discussed Braemar Towers' plumbing system.  He noted that it is a 30-year-old system with hot water tanks that did not reach temperatures high enough to kill Legionella, which is normally greater than 140 degrees Fahrenheit.  In fact, most of the tanks were incapable of heating water past 120 degrees Fahrenheit.  Dr. Barbaree also noted that, to his knowledge, there was no record of the Defendant cleaning out the boilers, and that stagnant water from an unused tank

mixed with incoming water when the unused tank was put back into service.  Dr. Barbaree stated that this situation provided a good habitat for propagating and spreading Legionella.  Further, in his experience, hot water tanks or boilers were often reservoirs for Legionella where the showerheads disseminated the aerosols containing Legionella.

Fifth, Dr. Barbaree discussed the environmental sampling that the Department performed on January 18, 2006.  The results showed that sixteen (16) of the twenty (20) water samples and eleven (11) of the twelve (12) swabs were positive for Legionella pneumophila, the species targeted by the urine antigen test and found in Plaintiff's condo unit.

Finally, Dr. Barbaree noted that three people who stayed at Braemar Towers during the same time period as Mrs. Flaherty contracted Legionnaire's Disease.  Dr. Barbaree then summarized all of the findings upon which he based his opinion that Mrs. Flaherty was exposed to Legionella Pneumophila at Braemar Towers, contracted Legionnaires' Disease, and died from this disease.

*Preliminary findings of the Court*

At the outset, the Court has determined that Plaintiff's proffered expert testimony concerning this incident is fatally flawed because the Plaintiff has no expert who can opine the standard of care for a professional property manager concerning the delivery of public water to a condominium unit.  Each of Plaintiff's experts acknowledges the condominium complex received

public water, that the water traveled through pipes and a hot water heater to the individual units, and that the water delivered to the individual units was maintained at a temperature in keeping with the water heater manufacturer's recommendations for proper operation and to avoid scalding.  Plaintiff has no qualified expert testimony establishing what standard of care must be observed by a professional property manager once the water arrives at the condominium complex to avoid the spread of legionella bacteria.  Dr. Clancy and Dr. Barabee are qualified to discuss legionaires disease and the characteristics of water that may lead to legionaires disease.  However, they are not qualified professional property managers who can assert the applicable standard of care creating a "duty" giving rise to a negligence claim.  There is no controlling Maryland case which sets forth the standard of care for the handling of public water delivered to a condominium, apartment complex, or other multiple occupancy unit.  There is no controlling or even analogous ordinance or statute on water quality that could guide the trial judge in setting forth a proper jury instruction on the "duty" element of negligence under Maryland law.  Because the Plaintiff cannot establish the applicable standard of care for the handling of public water by a professional property manager or condominium manager, there is a failure of proof on a required element "duty" of Plaintiff's claim, and therefore summary judgment for the defendant is appropriate.

## II. DISCUSSION

### A. Standard of Review

*Admissibility of Expert Testimony*

Federal Rule of Evidence 702 governs the admissibility of expert testimony. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 588 (1993). Rule 702 provides: "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." FED. R. EVID. 702. The trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable. *Daubert*, 509 U.S. at 589. Faced with a proffer of expert testimony, the trial judge must determine at the outset whether there is a preponderance of evidence that the expert is testifying to 1)scientific knowledge that will 2) assist the trier of fact to understand or determine a fact in issue. *Id.* at 592, 593 (citing *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987). In making this assessment, the judge must decide whether the reasoning or methodology underlying the testimony, rather than the generated conclusions, is scientifically valid, and whether that reasoning or methodology properly can be applied to the facts in issue. *Id.* at 592-93. The Supreme Court has held that the *Daubert* gate-keeping function applies not only to testimony

based on scientific knowledge, but to also to testimony based on

"technical and other specialized knowledge," and the district

court has flexibility when it decides how to determine

reliability. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137,

141-42 (1999).

*Summary Judgment*

Under Rule 56(c), the Court must grant summary judgment if

the moving party demonstrates that there is no genuine issue as

to any material fact and that the moving party is entitled to

judgment as a matter of law. *See* FED. R. CIV. P. 56(c).  In

reviewing a motion for summary judgment, the Court views the

facts in a light most favorable to the non-moving party. *See*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1996).  Once

a motion for summary judgment is properly made and supported, the

opposing party has the burden of showing that a genuine dispute

exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 586-87 (1986).  The mere existence of some alleged

factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment; the requirement

is that there be no genuine issue of material fact. *Anderson*,

477 U.S. at 248.  A "material fact" is a fact that might affect

the outcome of a party's case. *See id.* at 248.  Whether a fact

is considered to be "material" is determined by the substantive

law, and "[o]nly disputes over facts that might affect the

outcome of the suit under the governing law will properly

preclude the entry of summary judgment." *Id.* at 248.   A "genuine" issue concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor.  *Id.* at 248.   "Rule 56(e) requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).   Summary judgment is appropriate under Rule 56(c) against a party who cannot sufficiently establish the existence of a necessary element to that party's case, which that party will need to prove at trial. *Id.* at 322.

**B. Analysis**

<u>1. Expert Testimony</u>

The Court grants Defendant's Motion to Preclude Expert Testimony because the experts are not sufficiently qualified to establish the standard of care that a professional management company must exercise in maintaining and operating the water system of a condominium association in Ocean City, Maryland or the alleged breach of that standard that lead to the amplification and dissemination of Legionella.[3]  Further, because

---

[3]It is unclear whether Plaintiff proffers Dr. Clancy and Dr. Barbaree as experts who can provide an opinion within a reasonable degree of technical certainty on the appropriate industry standard of care and Defendant's alleged breach of that standard of care.  As discussed below, expert testimony in this area is necessary to establish the requisite element of duty, so

Plaintiff's proffered experts rely on inapplicable factual circumstances and materials in support of their opinions that Defendant negligently maintained the water system, their testimony is inadmissible to establish the requisite standard of care and breach thereof.  There are many different experts; a witness' expertise in one area does not necessarily qualify him as an expert in another. *Kumho Tire*, 526 U.S. at 150.

To qualify as an expert, the expert must possess a special skill, knowledge, or experience concerning the particular issue before the court. *See Oglesby v. General Motors Corp.*, 190 F.3d 244, 247-48 (4th Cir. 1999) (stressing that an expert must have specialized skills, knowledge, and experience in the particular field at issue, and experts cannot necessarily offer an expert opinion in a field that is even related to the field in which they possess expertise ).  The expert opinion must be based on this specialized knowledge and not on "belief or speculation." *Oglesby*, 190 F.3d at 250 (citation omitted).  In addition, the expert must employ a reliable methodology relevant to the issue before the court. *See Daubert*, 509 U.S. 592-93 (establishing that the judge must assess "whether the reasoning or methodology

_____

the Court will address whether the testimony of Plaintiff's proffered experts is sufficiently reliable and relevant that Plaintiff can adequately establish the requisite standard of care and allege breach thereof.  Further, although Dr. Barbaree does not expressly offer an opinion as to Defendant Legum & Norman Realty's failure to properly maintain and operate the water system, his discussion of the plumbing system in the report indicates that Defendant was negligent in its maintenance of the water system, so the Court will evaluate his ability to offer an opinion on this issue.

underlying the testimony is scientifically valid" and "whether that reasoning or methodology properly can be applied to the facts in issue.").

Many factors bear on the assessment of the admissibility of expert testimony, all of which may or may not apply to a specific set of circumstances: (1) whether the scientific knowledge is based on a methodology that can and has been tested, (2) whether the theory or technique has been subjected to peer review and publication, making the detection of flaws more likely, (3) the known or potential rate of error of particular scientific knowledge, and (4) the express degree of general acceptance among the relevant scientific community. *Daubert*, 509 U.S. at 593-594. These factors are meant to be helpful, not definitive. *Oglesby*, 190 F.3d at 250. Expert testimony used to establish duty must establish the standard of care within a reasonable degree of probability. *See Karl v. Davis*, 639 A.2d 214, 219 (Md. Ct. Spec. App. 1994), *cert. denied,* 647 A.2d 444 (Md. Sept. 14, 1994)(citing *Pierce v. Johns-Manville Sales Corp.*, 464 A.2d 1020 (Md. 1982)(stressing the principle that expert opinions must be established within a reasonable degree of probability, not mere possibility).

First, the Court precludes the proffered expert testimony because the witnesses do not have expertise in the area of professional property management, so they are not sufficiently qualified to testify regarding the requisite standard of care that Defendant owed Monica Flaherty and the alleged breach that

19

lead to the amplification and dissemination of Legionella in the water of Braemar Towers.  Plaintiff's proffered experts have no experience or qualifications regarding a professional management company's maintenance or operation of a water system in a large residential building.  (Pl.'s Opp. Motion to Preclude.)  Dr. Clancy is a microbiologist with degrees in microbiology and immunology, biochemistry, and environmental law.  Plaintiff even admits that Dr. Clancy is not a property manager and is not intended to give an opinion on property management.  (*Id.* at 8.)  In addition, Dr. Barbaree does not have the requisite educational or practical experience in the area of property management.  Dr. Barbaree has degrees in bacteriology, microbiology, and zoology, and his work experience deals with biological sciences.  Neither the focus or a substantial portion of his prior work deals with professional management of residential complexes or plumbing practices and standards.

Additionally, Plaintiff asserts that his witnesses are experts in the area of bacteria, specifically Legionella growth, in potable water systems.  (Pl.'s Opp. Motion to Preclude. 5,9.)  This may be relevant to the issue of what Legionella bacteria is, how it multiplies generally, and how transmission of Legionella can lead to Legionnaire's Disease, but this knowledge and experience has no relevance on the standard of care that a professional management company must exercise in maintaining a water system to prevent the amplification, dissemination, and transmission of Legionella.  This expertise of the proffered

experts may be relevant to the issue of causation, meaning they could, under the appropriate circumstances,[4] be qualified to assess whether Legionella bacteria was transmitted to Mrs. Flaherty while she stayed at Braemar Towers, resulting in her contracting Legionnaire's disease.  However, this expertise is not sufficient to support an expert opinion of what standard of care Defendant had a duty to exercise or that Defendant Legum & Norman Realty violated the appropriate standard of care of a professional management company, leading to amplification and dissemination of Legionella bacteria in the water system of Braemar Towers.  Therefore, the Court finds that Plaintiff's proffered experts do not have the educational or work experience that qualifies them to offer expert testimony on the duty that the professional management company owed to Monica Flaherty in operating and maintaining the water system or the alleged breach of that standard.

Second, the Court precludes the expert testimony because Plaintiff's proffered experts' methodology in arriving at an opinion as to the appropriate standard of care and the alleged breach thereof is not reliable or relevant.[5]  Plaintiff's experts

[4]The Court is not making a finding on whether Plaintiff's proffered experts' testimony in regards to causation is actually admissible in these circumstances.  The Court is merely asserting that Plaintiff's proffered experts' degrees and experiences would be more relevant to the issue of causation.

[5]As stated earlier, Dr. Barbaree does not expressly opine on Defendant's maintenance and operation of the water system.  However, Dr. Barbaree's discussion of the plumbing system at Braemar Towers references areas that are part of Defendant's

21

make broad generalizations as to what Defendant should do in maintaining and operating the water system at Braemar Towers that they cannot support or make more specific because they do not have adequate knowledge or expertise to make such statements. Further, the experts rely on inapplicable factual circumstances and materials to support their assertions that Defendant failed to properly operate and maintain the water system of Braemar Towers, leading to the amplification and dissemination of Legionella in the water that transmitted to Mrs. Flaherty.

Dr. Clancy stressed that good management practices, including regular inspection, maintenance, proper operation, and proper cleaning of the water system to prevent amplification are necessary to control Legionella.  In an attempt to demonstrate that Defendant Legum & Norman Realty did not exercise good management practices, she referenced the periodic leaks and a lack of consistency in the maintenance of the water temperature. She also called attention to lack of maintenance of a bag filter. Dr. Clancy's general assertion is not sufficient to demonstrate the appropriate standard of care at issue or the alleged breach thereof because 1) Dr. Clancy did not and cannot establish what could constitute regular inspection, maintenance, and operation of the water system, 2) Dr. Clancy did not and cannot show what practices Defendant actually engaged in that were inconsistent

---

responsibilities, so this supports the conclusion that Defendant failed to comply with its responsibilities and improperly maintained and operated the water system.

with the alleged good management practices, and 3) the alleged violations to which Dr. Clancy referred are not circumstances that Dr. Clancy previously mentioned would cause amplification and dissemination of Legionella bacteria.  Dr. Clancy cannot identify similar property managers who were responsible for public water maintenance at a multi-unit complex in order to set a framework for comparison of prudent practices.  While Dr. Clancy is not required to identify comparable property management practices, the absence of a known comparison or industry practice baseline undermines the reliability of Dr. Clancy's opinion. Because Dr. Clancy is not qualified to establish industry standards and practices of good maintenance and operation of a water system and cannot define what the standards and practices are, she is not qualified to establish Defendant's failure to comply with such standards and practices.  In addition, Dr. Clancy cannot attempt to show Defendant's failure to maintain and operate the water system properly by pointing out periodic leaks and lack of maintenance of a water filter because she is not familiar with the general practices and standards or commonly accepted mishaps that may occur in large residential buildings. Periodic leaks may be normal and accepted occurrences for large residential buildings over a period of time.  Further, Dr. Clancy does not know the standard practice for maintaining or changing filters, so she cannot testify to a reasonable degree of scientific or technical certainty that this demonstrates a violation of the standard of care of professionals in that

industry.  Accordingly, the Court finds that Dr. Clancy is not
qualified to support these broad assertions of the appropriate
standard of care and Defendant's alleged breach thereof, so these
unreliable statements are not admissible expert testimony.

Dr. Clancy also referred to the Department's investigation
report to stress its findings of an absence of a detectable level
of Legionella in the water from Ocean City, the presence of a
detectible level of Legionella in Braemar Towers' water supply,
and the remediation requirements.  Subsequent remedial measures
are inadmissible to prove negligence or culpability in connection
with an event that, if taken previously, the event might not have
occurred.  FED. R. EVID. 407.  *See Werner v. Upjohn Co., Inc.*, 628
F.2d 848, 859-60 (4th Cir. 1980) (explaining that subsequent
warnings required by the FDA were not admissible because
admission would subvert the policy goals of Rule 407).  However,
subsequent remedial measures can be used for other purposes.
Even if the report is being used to simply establish the
different Legionella levels, the Court does not find this
relevant because these measurements were taken after Mrs.
Flaherty contracted the disease, and there is no evidence that
the Legionella levels before Mrs. Flaherty contracted the disease
were the same as those in the report.  However, even assuming
that the Court accepts these levels as the levels before Mrs.
Flaherty contracted the disease, nothing in the report
establishes what Defendant must do in the normal course of
operations and ordinary care in maintaining the water system or

that Defendant's negligence caused the increased levels of
Legionella in the water.

Further, Dr. Clancy pointed out that various publications
are available that discuss building water supply operation,
maintenance, and training.  However, Dr. Clancy failed to mention
specifically the publications to which she referred that provide
standards and guidelines on the appropriate practices for which
Defendant would be responsible.  In addition, she did not
establish that such articles are focused on the practices of
maintaining water systems to prevent the multiplication of
Legionella.  Accordingly, publications that do not focus on the
practice of professional management companies of which Defendant
was not aware are not a relevant or reliable basis upon which Dr.
Clancy can evaluate Defendant's practices.

Next, Dr. Clancy pointed out that the training course for
plumbing certification has included training on Legionnaire's
Disease since the mid-1990s.  Again, the fact that a training
exists does not establish a specific standard of care for a
professional management company that Defendant failed to follow.
First, Dr. Clancy does not know whether Defendant received such
training.  Second, Dr. Clancy cannot offer testimony on the
substance of the training.  Finally, Dr. Clancy cannot offer
testimony of how Defendant's practices were not consistent with
the training.  Accordingly, the Court finds that this reference
is not relevant to establishing the standard of care or
Defendant's alleged breach of this specific standard.

Finally, Dr. Clancy referred to what she called a standard that the American Society of Heating, Refrigerating, and Air-conditioning Engineers ("ASHRAE") published in 2000, titled: "Minimizing the Risk of Legionellosis Associated with Building Water Systems."  First, it is important to note that ASHRAE's publication was a guideline, not a standard.  Therefore, any information included in the guideline is merely advisory.  Further, because Dr. Clancy is not a member of the profession and has no expertise or knowledge in the field, she cannot sufficiently assess the weight such guidelines are given in the field of professional management of large residential buildings and to what extent professional management companies follow such guidelines.  In addition, ASHRAE's mission is to advance the arts and sciences of heating.  ASHRAE is not focused on the specific practices of professional management groups.  In fact, the guideline to which Dr. Clancy refers begins with "if practical," demonstrating that in many circumstances such guidelines may not be appropriate.  Again, Dr. Clancy is not qualified to assess the applicability of the guideline and whether it would be practical in the circumstances of Braemar Towers in the relevant time period.  Finally, other literature put forth by ASHRAE, such as ASHRAE's position paper on controlling the multiplication of Legionella, also does not establish the appropriate standard of care.  For example, merely recommending periodic cleaning if appropriate and maintaining parts in working order does not establish an adequate standard with which Defendant's actions can

26

be compared because they are not specific and do not delineate the circumstances in which such practices would be appropriate. Accordingly, the Court does not view the ASHRAE guidelines as creating an industry standard or industry practice that Defendant had to, and failed to, follow.

In addition, both Dr. Barbaree and Dr. Clancy referred to the temperature of the hot water tanks, noting that most boilers at Braemar Towers did not heat above 120 degrees Fahrenheit. (July 17, 2006 Aff. of Linda Fulkersin, at ¶ 14.)  They assert that the temperature must be greater than 140 degrees Fahrenheit to kill and control Legionella present in the water.  However, the manual of the water system at Braemar Towers advises that the temperature should not get higher than 120 degrees Fahrenheit because of the danger of scalding.  (July 17, 2006 Aff. of Linda Fulkersin, at ¶ 11.)  Dr. Clancy even admitted that acting in compliance with the manufacturer's manual is responsible operation of a water system.  (June 7, 2006 Dep. of Dr. Jennifer Clancy, at 47.)  Dr. Clancy and Dr. Barbaree, with no experience in the profession, have no way of offering an opinion on how the industry deals with the conflicting issues of scalding and the growth of bacteria, and they cannot simply opine that failure to maintain a temperature of 140 degrees Fahrenheit is negligent operation of the water system.  Plaintiff should have brought forth an expert who could explain how professional management companies responsible for large residential buildings maintain temperatures high enough to prevent the amplification of

Legionella while not scalding the residents of the building.
Accordingly, the Court finds that the experts are precluded from
offering the opinion that Defendant had a duty to maintain the
temperatures at 140 degrees Fahrenheit because that may not be
the appropriate standard of care of professional management
companies where there are other factors and dangers involved, and
Plaintiff's proffered experts are not qualified to establish the
appropriate practices in the profession.

In addition, Dr. Barbaree mentioned that to his knowledge
there was no record of the cleaning of the boilers.  This
testimony is unreliable because the basis of Dr. Barbaree's
knowledge is unclear.  Further, Dr. Barbaree is not qualified to
testify as to the appropriate practice in terms of cleaning the
boilers and recording the cleaning of the boilers.  He cannot
establish how many times a boiler should be cleaned or if and
when that cleaning needs to be recorded.  In addition, Dr.
Barbaree, with no knowledge or expertise in the field, is not
qualified to evaluate Defendant's practices based on any standard
or the consequences for such a violation.  Accordingly, the Court
finds that Dr. Barbaree is not qualified to make an assessment on
the cleaning of the boilers or records of such maintenance, so he
cannot use this as a basis for his opinions.

Finally, Dr. Barbaree suggested that stagnant water from an
unused tank mixed with incoming water when the unused tank was
put back into service, creating a good habitat for Legionella.
Again, this testimony is unreliable on its face and as a basis

28

for any opinion regarding the standard of care.  First, the basis
of Dr. Barbaree's vague assertion is unclear.  He stated that "it
appeared" stagnant water from the unused tank mixed with the
other water but does not further explain his observation or the
foundation for such observation.  Second, in his view as a
scientist, such mixing of the different water may not be
appropriate.  However, Dr. Barbaree is not in a position to
assess whether the mixing of the water is common practice in the
management of the water systems of large residential buildings.
In other words, he is not qualified to establish the standard of
care in this field.  Therefore, he cannot assess whether
Defendant is in fact violating the standard of care.
Accordingly, the Court finds that Dr. Barbaree's opinion is
unreliable, and therefore, inadmissible.

In Plaintiff's opposition to preclude expert testimony,
Plaintiff focuses on a case from the United States District of
Vermont, *Adel v. Greensprings of Vermont, Inc.*, 363 F. Supp. 2d
683 (D. Vt. 2005), to support the propositions that 1) the
*Daubert* factors are not always applicable when assessing the
admissibility of expert testimony, and 2) that Dr. Clancy's
proffered testimony, which was allegedly similar to the testimony
and factual circumstances at issue, was admissible in that case.
The Court agrees that expert testimony does not always have to
satisfy the *Daubert* factors in order to be admissible under
Federal Rule of Evidence 702.  The *Daubert* factors merely aid the
trial judge in deciding whether the testimony is relevant and

reliable, but the judge can look to other circumstances when appropriate.

However, the Court finds that the expert testimony and factual circumstances here are different than those present in *Adel*, and accordingly, does not find the case persuasive in arguing for admissibility of Dr. Clancy's testimony in this case. In *Adel*, the court found that Dr. Clancy's testimony was admissible regarding the negligent maintenance of the water system because she based her conclusions on failure to comply with regulations, failure to conduct required testing, inadequate well vents, and inadequate storage overflow. However, here, Dr. Clancy has not asserted an applicable standard, such as guidelines or regulations, with which she can assess Defendant's actions to determine that the management company was in fact negligent in maintaining the water system such that Legionella multiplied and created a health risk. Here, there are no state or local regulations that mandate a particular standard, and any guidelines that Dr. Clancy refers to are merely advisory and are not applicable in these circumstances. Further, in *Adel* Dr. Clancy pointed to specific maintenance failures that would create an environment for the growth and multiplication of Legionella, such as improper well vents and storage overflow. She also referenced surveys taken prior to the health risk that indicated improper maintenance and the presence of a health risk. In contrast, in this case Dr. Clancy referred to leaky pipes and improper maintenance of a bag filter, but she merely used these

to indicate that Defendant generally did not adequately maintain the water system.  She does not indicate that these specific maintenance failures in any way amplified or disseminated the Legionella bacteria in this particular water system or in general.  In addition, the Department investigation in this case took place after Mrs. Flaherty's death, so, unlike *Adel*, there is no evidence that Defendant was improperly operating and maintaining the water system or had knowledge that their water system created a health risk.  Finally, in the present case, Dr. Clancy places great weight on the role that the improper temperatures had in amplification and dissemination of the Legionella bacteria.  However, unlike *Adel*, where the defendants violated regulations and guidelines in the maintenance of their water system, in the present case Dr. Clancy cannot point to any state or local regulations or guidelines that require Defendant to maintain their water system at a specific temperature.  In fact, Dr. Clancy agreed that maintaining a temperature in accordance with the manufacturer's instruction manual of the system would in fact be appropriate.  (June 7, 2006 Dep. of Dr. Jennifer Clancy, at 47.)  The instruction manual for the water system at issue expressly advises against the high temperatures that Dr. Clancy suggests are necessary to prevent Legionella multiplication in order to avoid scalding.  (July 17, 2006 Aff. of Linda Fulkersin, at ¶ 11.)  Dr. Clancy is not qualified to make an assessment of how Defendant should deal with the conflicting concerns of Legionella multiplication and scalding.

31

Accordingly, the Court does not find *Adel* to be persuasive authority in support of admissibility here because there are too many distinguishing factors that make the circumstances and testimony critically different.

The Court will not evaluate the proffered testimony on the issue of causation, including assessing the methodology that the experts employed in analyzing the presence of bacteria in the water of Braemar Towers and the alleged transmission of that bacteria to Mrs. Flaherty.  The Court will not make such an assessment because the Court has found that the proffered experts cannot adequately establish a standard of care establishing a duty or breach of that duty, and, as explained below, such expert testimony is necessary to make a prima facie case of the requisite elements of negligence.

2. Common law negligence

The Court grants Defendant Legum & Norman Realty's Motion for Summary Judgment because Plaintiff Flaherty cannot establish the element of duty that is necessary to prove a claim of negligence under Maryland law.  Under Maryland law, as part of its prima facie claim of negligence, plaintiff must allege facts demonstrating that (1) the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual loss or injury, and (4) that the loss or injury proximately resulted from the defendants breach of the duty.  *Patton v. U.S. Rugby Football, Union, Ltd.*, 851 A.2d 566, 570 (Md. 2004) (citation omitted).

The existence of a legal duty is a question of law to be decided by the court. *Id.* Expert testimony is generally required when the subject is "so particularly related to some science or profession that it is beyond the ken of the average layman." *Cigna Property and Casualty Companies v. Zeitler*, 730 A.2d 248, 258 (Md. Ct. Spec. App. 1999). Generally, a plaintiff must produce expert testimony to prove the standard of skill and care ordinarily exercised by a professional person of the kind involved in the geographical area involved and that the defendant failed to meet these standards. *Id.* at 464.

Here, Maryland law requires expert testimony to establish the standard of care that Defendant Legum & Norman Realty, a professional management company, must exercise relative to the condominium owners. The standard of care that Defendant Legum & Norman, a professional management company, must exercise in maintaining its water system is beyond the knowledge and experience of the average layman. Average laymen are not sufficiently experienced or knowledgeable to assess what proper practices a professional management company must exercise in maintaining and operating a water system in a large residential complex. Because the Court finds that Plaintiff's experts cannot offer expert opinion regarding the standard of care of professional management companies in the Ocean City, Maryland community, Plaintiff cannot prove the element of duty, and, therefore, cannot establish the necessary elements of a negligence claim. *See Doe v. Pharmacia & Upjohn Co., Inc.*, 879

33

A.2d 1088, 1092 (Md. 2005) ("There can be no negligence where there is no duty that is due; for negligence is the breach of some duty that one person owes to another.").

Plaintiff argues that there is no need for expert testimony because lay persons can clearly and easily understand that Defendant Legum and Norman Realty had a duty to maintain the water system and average laymen have enough exposure to understand a professional management company's responsibilities. (Pl.'s Opp. Motion to Preclude. 2-3.) However, this conclusion is flawed because Plaintiff does not define that duty or elaborate on what the maintenance and operation practices entail. Such specification is necessary in order to establish that Defendant failed to meet this standard of care. Further, lay persons, in determining whether Defendant Legum & Norman Realty met the requisite standard, cannot possibly have enough familiarity with the responsibilities of a professional management company in maintaining a water system that supplies water to an entire condominium complex. Average laymen may be familiar and knowledgeable with maintaining and operating a water system in a single residence. However, allowing a juror to compare maintaining the water system within a single house to maintaining a much larger and more complex water system that serves many different units, allows jurors to speculate about the requisite standard of care. The Court finds that there are just too many variables that a juror cannot possibly account for without the aid of an expert, such as size of the system,

balancing the concerns of bacteria multiplication and scalding, the number and extent of the pipes associated with the system, number of units serviced by the system, the operations involved in circulation and flow of the water throughout the system, the different responsibilities when the complex is less populated, etc.  Such speculation is not permitted.  Without expert testimony setting forth the appropriate maintenance and operation of the water system, the Court finds that Plaintiff cannot establish the standard of care that Defendant Legum and Norman Realty had to meet in maintaining and operating the water system or the alleged breach thereof.

The Court finds that summary judgment is appropriate here absent alternative proof of the element of duty because Plaintiff failed to produce a qualified expert that can aid the jury in establishing the applicable duty and breach of that standard of care.  Plaintiff has not produced any other evidence of the requisite standard of care, such as government regulations or industry standards, that could perhaps establish the requisite element of duty.  Plaintiff attempts to no avail to piece together various circumstances surrounding the incident to establish a standard of care and the violation of this duty. Plaintiff comments on Defendant's failure to apply Occupational Safety and Health Administration ("OSHA") standards in maintaining the water system, Defendant's failure to maintain a water temperature that would prevent the influx of Legionella, Defendant's failure to investigate local Legionella outbreaks,

Defendant's failure to attend local seminars on Legionella and Legionnaire's disease, and Defendant's failure to engage in preventive maintenance as demonstrated by the condition of the pipes, the maintenance of a filter, and the constant running of the booster pump.  Here, Plaintiff is relying on "belief and speculation" as to how a professional management company should operate.  These assertions, when analyzed, are not relevant to the issue before us, and the Court finds that Plaintiff fails to establish the requisite standard of care.

First, it is logical and reasonable for Defendant not to employ OSHA standards in managing the water system of a condominium complex that it serves.  The purpose of OSHA regulations is to protect employees from occupational safety hazards.[6]  It is reasonable for Defendant not to apply these standards in its management of a residential complex where it serves residents, not employees.  Employees and residents are completely different communities with different circumstances, concerns, purposes, and factors that need to be considered.  Accordingly, the Court finds that OSHA standards do not establish the applicable standard of care that a professional management company must exercise in maintaining and operating a water system in a large residential complex.

---

[6]"The Occupational Safety and Health Administration aims to ensure worker safety and health in the United States by working with employers and employees to create better working environments."  OSHA FACTS, *available at* http://www.osha.gov/as/opa/oshafacts.html. OSHA standards focus on on-the-job injuries and fatalities.  *Id.*

In addition, Plaintiff's reference to other publications are also not relevant to establish the requisite duty of care. Plaintiff points out that Defendant was a member of the Institute of Real Estate Management ("IREM"), and IREM included an article in its July/August 2001 membership publication, "Adopting Sensible Solutions for an Eco-Friendly Environment." This article stated that Legionnaire's Disease was one of the most important environmental issues that mattered to the property management industry in the early 1990s. This article does not establish the standard of care or Defendant's breach thereof because there is no evidence that Defendant was aware of this article. Defendant's membership in a particular organization does not mean that Defendant is responsible for all of the publications rendered by that organization. Further, the article discusses the focus on Legionnaire's Disease in the early 1990s, almost ten years before Mrs. Flaherty's contraction of Legionnaire's Disease. Finally, there is no evidence that Defendant had to comport with any information contained in publications from this organization or even that the publications established standard practices of the industry. Accordingly, the Court does not find this publication relevant to establish the standard of care, Defendant's knowledge of the problem around the time of Mrs. Flaherty's contraction of Legionnaire's Disease, or the breach of the standard of care.

Plaintiff also refers to publications and guidelines established by ASHRAE. Such guidelines and publications alone

are not enough to establish the standard of care that professional management companies must exercise in managing and operating water systems in residential complexes.  As discussed earlier, the purpose of ASHRAE is to advance the arts and science of the industries, and it does not necessarily establish the standard of care for the practice of such sciences for companies within the field.  Further, the guidelines and publications are merely advisory.  The guidelines and publications themselves indicate that the suggestions, such as maintaining the water at a temperature above 131 degrees Fahrenheit, should be used when practical and appropriate.  Plaintiff would have needed to proffer an expert in the industry who could explain the circumstances in which the recommendations suggested in these articles and guidelines would have been appropriate.  Therefore, the guidelines and recommendations in the publications alone cannot establish the standard of care that members of the profession practice in managing large residential complexes.

In addition, Plaintiff argues that Defendant had a duty to maintain the water temperature at a level that would prevent the influx of Legionella.  As explained above, Plaintiff cannot apply this standard directly to the maintenance of the temperature of a water system in a large residential complex because there are other factors that need to be considered, such as scalding.  In fact, Plaintiff's proffered expert even admits that Defendant's compliance with the temperature in the operation manual of the water system is completely reasonable.  (Def.'s Br. 14.)  Without

expertise to determine what the professional management company should have done to maintain a temperature that could control Legionella while simultaneously not scalding residents, Plaintiff cannot establish that Defendant Legum & Norman Realty had a duty to maintain the temperature at 140 degrees Fahrenheit because that may not in fact be the ordinary standard of care and practice in the relevant technical community.  Plaintiff asserts that mixing valves can be used to ensure the prevention of scalding.  Again, Plaintiff fails to produce evidence that the industry standard of care requires the use of mixing valves, when such a practice is appropriate, or that Defendant was even aware of the practice of using mixing valves.  Simply asserting that use of a mixing valve is a technique that could control temperatures does not directly support the proposition that such technology is the standard of care exercised by professionals in the field of property management.  Accordingly, the Court finds that the plaintiffs' experts' mere assertion that the hot water heater required a temperature of 140 degrees to control Legionella does not establish the requisite standard of care that Defendant must exercise in maintaining and operating the water system at Braemar Towers.

Plaintiff also argues that Defendant should have investigated further the outbreak of Legionella at a nearby establishment and educated itself about Legionella by attending local seminars.  Plaintiff cannot establish that the ordinary care exercised by a professional management in the relevant

community would be to extensively investigate the activities of surrounding establishments.  Plaintiff argues that Defendant should have investigated its own practices and tested its own water supply after learning of an alleged outbreak of Legionella at a local hotel, The Princess Royale Hotel, in Ocean City a year before Mrs. Flaherty's death.  The Princess Royale Hotel is apparently located within two miles of Braemar Towers.  However, Plaintiff's assertion fails because, viewing the evidence in the light most favorable to Plaintiff, there is no evidence that the water system and factual circumstances surrounding the Legionella outbreak at the hotel were similar to the water system and factual circumstances present at Braemar Towers.  In fact, Defendant's operations manager and on-site manager testified in deposition that it was their understanding that the hotel's problem stemmed from a cooling tower, not a water system.  (June 6, 2006 Aff. Of Linda Fulkersin, at 56.)  Further, failure to investigate the circumstances of a nearby establishment, without more, does not establish Defendant's liability in this instance because there is no evidence that even if they had investigated they would have learned anything relevant or would have been required to change their own practices.  Accordingly, Defendant's failure to extensively investigate the circumstances of a Legionella outbreak in a nearby hotel, does not qualify to establish a standard of care or violation of that standard in the present circumstances.

In addition, Plaintiff argues that before Mrs. Flaherty's

death, the hotel/motel and restaurant trade association held a
seminar addressing Legionella.  First, Plaintiff cannot prove
that it is within the standard of care of the management company
of a condominium complex to attend a seminar held by a hotel and
restaurant trade association.  Further, Plaintiff cannot use this
example to demonstrate breach of a standard of care because there
is no evidence that Defendant was held to the standards of this
association, was a member of the association that held the
seminar, was aware of this seminar, or attended this seminar.
Plaintiff's statement of disputed facts expressly states that
Defendant was not present at the seminar.  Plaintiff cannot
establish that exercising ordinary care requires Defendant to
attend such seminars, or that it is required to act in accordance
with information provided by such seminars.  In addition, there
is no evidence of what was even presented at this seminar or that
Defendant's practices were not in accordance with such practices.
Plaintiff cannot prove that Defendant was on notice of the
alleged dangers within its water system by pointing to
Defendant's failure to attend a local hotel association seminar.
Accordingly, Defendants's failure to attend the seminar or act in
accordance with the information presented, does not establish
Defendant's duty or breach of that duty.

Plaintiff further asserts that Defendant's system was in
constant disrepair, referring to evidence of leaky pipes, a
constantly running boiler, and improperly maintained filter.
However, Plaintiff fails to specify what a lack of preventive

maintenance entails and fails to set forth the required maintenance level of the system of a large condominium complex. The assertion that Defendant failed to engage in preventive maintenance specifically requires the assistance of expert testimony to determine the degree of care that Defendant Legum & Norman Realty must exercise in maintaining various aspects of its system, and Plaintiff needs to assert some proof that the status of the pipes and other references to the condition of the system demonstrated Defendant's failure to meet the standard of care such that Legionella would infiltrate the water system. Further, according to Plaintiff, the Legionella influx was due to improper temperature and filter, not to improper maintenance of the pipes or constantly running boiler. Simply stating that the system was in disrepair does not establish the requisite element of duty, nor does it create the requisite causal link to the influx of Legionella in the water system, especially considering the fact that Legionella are commonly found in domestic water systems. Centers for Disease Control and Prevention, Legionellosis: Legionnaires' Disease (LD) and Pontiac Fever, Frequently Asked Questions (Oct. 12, 2005), http://www.cdc.gov/ncidod/dbmd/ diseaseinfo/legionellosis_g.htm#1. Accordingly, the Court finds that Plaintiff's reference to a general lack of preventive maintenance and examples of problems with the water system at Braemar Towers do not establish the standard of care of professional management companies or the breach of that standard

42

of care that served as the proximate cause for the amplification
and dissemination of Legionella in the water system of Braemar
Towers.

Finally, Plaintiff attempts to establish a duty and alleged
breach thereof by defining the situation broadly.  Plaintiff
asserts that the water received from Ocean City contained no
detectible level of Legionella, but the water in Braemar Tower's
water system contained high levels of Legionella.  Plaintiff
argues that it was Defendant Legum & Norman Realty's
responsibility to maintain the water supply, so the fact that the
water was contaminated demonstrates the breach of their duty.
The Court finds that such a broad definition of the circumstances
cannot establish a negligence claim because Plaintiff cannot
specifically point to the standard of care that Defendant was
required to exercise in maintaining its management
responsibilities and also cannot establish how Defendant violated
that standard.  Plaintiff cannot establish breach of duty simply
by focusing on the resulting injury.  In the alternative, the
Court views this broad scope of the issue as an attempt at
establishing, although not expressly, a claim for negligence
under the doctrine of *res ipsa loquitur*.

Even assuming that the tests performed after Mrs. Flaherty's
death showing the respective levels of Legionella in Ocean City
water and the water of Braemar Towers reflect the status of the
water before Mrs. Flaherty's death, the Court finds that *res ipsa
loquitur* does not apply to the present circumstances.  To rely on

the doctrine of *res ipsa loquitur*, Plaintiff must first prove
that the injury would not have occurred in the absence of
Defendant's negligence. *Holzhauer v. Saks & Co.*, 697 A.2d 89, 93
(Md. 1997).  To invoke the doctrine of *res ipsa loquitur* and
create an inference of defendant's negligence, three elements
must be proven: 1) a casualty of a kind that does not ordinarily
occur absent negligence, 2) that was caused by an instrumentality
exclusively within defendant's control, 3) that was not caused by
an act or omission of the plaintiff. *Id.* at 92-93 (citing *Dover
Elevator Co. v. Swann*, 638 A.2d 762, 765 (Md. 1994).  To invoke
this doctrine, Plaintiff has to demonstrate sufficient exclusive
control to support a reasonable, nonspeculative conclusion by the
fact finder that Defendant's negligence, and not that of a third
party, was the cause of the accident. *See id.* at 93 (finding
that there were equally likely explanations other than
[defendant's] negligence that could have caused the injury).

Here, Plaintiff fails to meet all of the necessary elements
to prove negligence under the doctrine of *res ipsa loquitur*.
*Tucker v. University Specialty Hosp.*, 887 A.2d 74, 79
(Md. Ct. Spec. App. 2005) ("In order to rely upon the doctrine
[of *res ipsa loquitur*] successfully, a plaintiff must present
evidence of '(1) a casualty of a kind that does not ordinarily
occur absent negligence; (2) that was caused by an
instrumentality exclusively in the defendant's control; and (3)
that was not caused by an act or omission of the plaintiff.'" ).

44

First, it was established that Legionella are ubiquitous and are present in all water sources, so the presence of Legionella in the water supply of Braemar Towers could have occurred absent Defendant's negligence.  (June 7, 2006 Dep. of Dr. Jennifer Clancy, at 15-16.)  Further, Plaintiff cannot prove that there were no intervening factors that could have caused Plaintiff's injury, including the fact that all other possible sources of transmission were not conclusively eliminated.  Because this injury can happen absent ordinary negligence, and there could have been other causes outside Defendant's control, the Court finds that Plaintiff cannot make a case for negligence under the doctrine of *res ipsa loquitur*.

Therefore, the Court finds that Plaintiff's attempts to establish a standard of care and ultimate common negligence claims are inapplicable and irrelevant.  Plaintiff has not produced any regulations, laws, or mandatory guidelines and standards to establish the standard of care that Defendant had to exercise.  The Court maintains that Plaintiff had to produce a qualified expert in the relevant industry community to establish the standard of care that Defendant Legum & Norman was required to exercise.  Plaintiff has failed to produce a qualified expert to establish the appropriate standard of care.  Accordingly, the Court grants summary judgment on Plaintiff's negligence claim.

## 3. Gross Negligence

The Court grants Defendant's Summary Judgment on Plaintiff's claim of gross negligence because Plaintiff cannot establish that

45

Defendant intentionally disregarded its duty to Monica Flaherty.
Gross negligence is "an intentional failure to perform a manifest
duty in reckless disregard of the consequences as affecting the
life or property of another." *Marriott Corporation v. Chesapeake
& Potomac Telephone Co. of Md.*, 723 A.2d 454, 462 (Md. Ct. Spec.
App. 1999), *cert denied,* 729 A.2d 405 (Md. May 14, 1999).
Because Plaintiff cannot initially establish that Defendant owed
a duty to Plaintiff, Plaintiff cannot prove that Defendant
intentionally failed to perform any duty or acted with wanton or
reckless disregard of consequences.  Plaintiff's attempts at
establishing Defendant's recklessness by not investigating an
outbreak in the area and ignoring publications, seminars, and
mishaps within the system do not establish recklessness or
wantonness.  As explained previously, none of the publications
have been established as providing mandated guidelines or even
standards that directly applied to professional management
companies in their care of residential complexes.  Further,
Defendant's lack of extensive investigation into a Legionella
outbreak does not establish recklessness because Defendant was
reasonably under the belief that the circumstances of the
establishment where the outbreak occurred were materially
different than the circumstances at Braemar Towers.  Finally,
reference to mishaps with the water systems or a plumbers'
suggestion to increase the water temperatures do not establish
reckless and wanton disregard of the multiplication of Legionella
because the mishaps with the system such as periodic leaks are

46

not amplifying factors for Legionella.  Further, it was
completely reasonable, and not in fact reckless and wanton for
Defendant to disregard the suggestion of the plumber to increase
the temperature because Defendant was following the
manufacturer's operation manual that advised the maintenance of
far lower water temperatures to avoid scalding.  Therefore,
summary judgment in favor of Defendant on the issue of gross
negligence is granted.

4. Punitive Damages

The Court grants Summary Judgment in favor of Defendant on
Plaintiff's claim for punitive damages.  Because Plaintiff was
unable to make out a case for gross negligence, Plaintiff cannot
establish a claim for punitive damages.

It is hereby

ORDERED that Defendant Legum & Norman Realty Inc.'s Motion to Preclude Expert Witnesses is GRANTED.  It is further

ORDERED that Defendant Legum & Norman Realty Inc.'s Motion for Summary Judgment is GRANTED.

The Clerk is directed to enter a separate Fed. R. Civ. Pro. 58 final judgment order and forward a copy of this Order to counsel of record.

ENTERED this ___4__ day of January, 2007.


_____/s/_____
Gerald Bruce Lee
United States District Judge

Alexandria, Virginia
01/04/07